COPY

1   Manatt, Phelps & Phillips, LLP
    STANLEY W. LEVY (Bar No. CA 038051)
2   E-mail: slevy@manatt.com
    CRAIG J. DE RECAT (Bar No. CA 105567)
3   E-mail: cderecat@manatt.com
    CRAIG S. RUTENBERG (Bar No. CA 205309)
4   E-mail: crutenberg@manatt.com
    11355 West Olympic Boulevard
5   Los Angeles, CA 90064-1614
    Telephone: (310) 312-4000
6   Facsimile: (310) 312-4224

7   *Attorneys for Plaintiff*
    ASCANIO CARIMATI DI CARIMATE
8

9                   UNITED STATES DISTRICT COURT

10                 CENTRAL DISTRICT OF CALIFORNIA

11

12   ASCANIO CARIMATI DI              Case No.
     CARIMATE, an individual,
13                                    COMPLAINT FOR:
                   Plaintiff,
14                                    (1) BREACH OF CONTRACT;
           vs.                        (2) BREACH OF IMPLIED
15                                        COVENANT OF GOOD FAITH
     GINSGLOBAL INDEX FUNDS, a            AND FAIR DEALING;
16   California corporation; and      (3) BREACH OF FIDUCIARY DUTY;
     ANTHONY GINSBERG, an             (4) CONSTRUCTIVE TRUST;
17   individual,                      (5) FRAUD;
                                      (6) NEGLIGENT
18                 Defendants.            MISREPRESENTATION;
                                      (7) UNJUST ENRICHMENT; and
19                                    (8) ACCOUNTING

20

21                                    DEMAND FOR JURY TRIAL

22

23

24

25

26

27

28

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

41365278.3

COMPLAINT

1    Plaintiff Ascanio Carimati di Carimate ("Carimati") brings this action against
2  the named Defendants for damages and equitable relief as follows:
3    1.    As described in this Complaint, Carimati seeks damages and equitable
4  relief based upon defendant GinsGlobal Index Funds' ("GinsGlobal") wrongful
5  termination of a five year exclusive joint venture to market and sell certain financial
6  and insurance products – the Hindsight Products.  The Hindsight Products' unique
7  features make them highly attractive to a wide variety of individual investors, asset
8  managers, banks, and insurers.  Under the joint venture agreement between
9  Carimati and GinsGlobal, Carimati was responsible for marketing the Hindsight
10  Products world-wide.  However, after Carimati's efforts established the viability
11  and potential global success of Hindsight Products, GinsGlobal prematurely and
12  without cause terminated the joint venture in order to retain the benefit of all
13  Hindsight Product business for itself, and has failed and refused to provide Carimati
14  an accounting and payment of his share of the revenues from the joint venture.

15                              **THE PARTIES**
16    2.    Plaintiff Ascanio Carimati di Carimate ("Carimati") is a citizen of the
17  United States, with a principal residence in Milan, Italy.
18    3.    Defendant GinsGlobal Index Funds ("GinsGlobal") is a California
19  corporation with its principal place of business in Los Angeles, California.
20    4.    Defendant Anthony Ginsberg ("Ginsberg") is an individual, who upon
21  information and belief, resides, is employed, and/or does business in this judicial
22  district.  Ginsberg is the Managing Director of GinsGlobal.
23    5.    Defendants, and each of them, are individuals and business entities
24  who, upon information and belief, are acting in concert and active participation
25  with each other in committing the wrongful acts alleged herein.  Plaintiff is
26  informed and believes, and on that basis alleges, that at all relevant times each of
27  the Defendants was the agent and employee of each of the remaining Defendants,
28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41365278.3                              1
                                  COMPLAINT

1   and in doing the things herein alleged, was acting within the course and scope of

2   that agency.

### JURISDICTION AND VENUE

3

4       6.    The Court has diversity jurisdiction over the claims alleged herein

5   under 28 U.S.C. § 1332 because this is a civil action between the citizens of

6   different states and the amount in controversy exceeds $75,000.

7       7.    Venue is proper in this district under 28 U.S.C. § 1391(a).

### GENERAL BACKGROUND

8

9       8.    Carimati is an experienced investment professional, who has worked

10  for over 12 years in the financial investments field.  He developed and was

11  responsible for the international institutional sales and trading group at a prominent

12  New York brokerage, eventually amassing a client portfolio with over $10 billion

13  in tradable assets under management.  As a result of this experience, Carimati has

14  developed relationships with a diverse group of bankers, brokers, asset managers,

15  executives, and high net worth individuals located around the world.  Carimati was

16  president of and has served on the board of two Italian commercial real estate firms,

17  and has consulted on several large, private alternative investments in the United

18  States, United Kingdom, Latin America, and the Middle East.

19      9.    GinsGlobal specializes in indexed financial products.  Indexing is an

20  investment strategy designed to match the performance of a specific equity or bond

21  market index, such as the Standard & Poor's 500, the Eurostoxx 50 (Europe), or the

22  Hang Seng (China).  Indexing provides a diversified investment vehicle that

23  spreads an investor's money over the entire market.  Indexing is often described as a

24  passive investment approach, as an index product simply tracks the movement of

25  the selected index.  When the index goes up, the value of the investment goes up in

26  the same amount; when the index declines, so too does the investment, also in the

27  same amount.

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41365278.3

2

COMPLAINT

**THE HINDSIGHT PRODUCT**

10.    Carimati is informed and believes, and thereon alleges, that, GinsGlobal developed the Hindsight Index Product (the "Hindsight Product") approximately 5 years ago.  The Hindsight Product concept comes in many variations and is highly adaptable, and may include a wide variety of indexes or actively managed funds.  The Hindsight Product concept is marketed and sold as both an insurance product or as a stand-alone investment.  Carimati is informed and believes, and thereon alleges, that GinsGlobal currently markets and sells Hindsight Products directly to its clients, and also markets and licenses the Hindsight Product concept to third parties, who in turn market and sell Hindsight Products to their clients under their own brand.

11.    In 2007, GinsGlobal's biggest customer for Hindsight Products was American General Life Insurance Company ("American General Life").  American General Life's Hindsight Product, called Elite Global, has been a tremendous success in the United States, and by the beginning of 2008, shortly after its first year on the market, it accounted for almost $6 billion in new assets under management by American General Life.  As a result of this success, American General Life licensed three additional Hindsight Products from GinsGlobal.

12.    Although GinsGlobal had successfully marketed and sold Hindsight Products domestically, GinsGlobal had not focused on marketing and licensing Hindsight Products in Europe.

**CARIMATI AGREES TO MARKET AND DEVELOP HINDSIGHT PRODUCTS IN EUROPE**

13.    In or about February 2007, Carimati and Ginsberg met in GinsGlobal's Los Angeles office.  Ginsberg introduced Carimati to the Hindsight Product concept.  Ginsberg asked Carimati if he could help GinsGlobal market the Hindsight Product in Europe as GinsGlobal had not made a dedicated effort to focus on the European market to date.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41365278.3                                    3

COMPLAINT

14.     In July 2007, prior to agreeing to undertake that effort, Carimati investigated the Hindsight Product and conducted due diligence to determine whether he was interested in dedicating his time, skill, and efforts to marketing Hindsight Products in Europe. After concluding both that the Hindsight Product concept was sound and that demand existed for such products, Carimati proposed to Ginsberg that they form a joint venture dedicated to the international distribution of Hindsight Products.  Ginsberg responded favorably and Carimati and Ginsberg orally agreed to form the joint venture and together began developing a business plan.  At the time, Carimati and Ginsberg agreed that Carimati would pay for his expenses incurred in the marketing and promotion of Hindsight Products until the joint venture was generating sufficient revenues to reimburse Carimati for those expenses and cover all ongoing operating expenses.

15.     Based upon this oral agreement with Ginsberg, Carimati began to introduce the Hindsight Product concept to his contacts in Europe.  Carimati's contacts reacted favorably to the Hindsight Product, and expressed interest in exploring formal relationships that would allow them to market and sell Hindsight Products to their clients and help distribute the product to third parties as well.

16.     In the fall of 2007, Carimati proposed to Ginsberg that they create a "Board of Advisors" comprised of high-level businesspersons in the sectors and geographic markets targeted by Carimati and Ginsberg for the sale of the Hindsight Product.  The Board of Advisors would "open doors" for the joint venture, using a cost-effective, top-down approach to accelerate market penetration.  To execute this "top-down" plan, Carimati focused on identifying third parties that could be licensed to sell Hindsight Products through their own sales force.

17.     One of the first people Carimati approached about a position on the Board of Advisors was John McCloy, who Carimati knew to have a number of contacts in Germany.  One of the joint venture's key targets was German-based Allianz Insurance, one of the largest insurance and investment companies in the

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41365278.3                                    4
COMPLAINT

1    world.  McCloy expressed serious interest in the Hindsight Product and

2    immediately identified potential clients that he could arrange meetings with,

3    including Dr. Joachim Faber, CEO of Allianz Global Investors ("Allianz"), the

4    international asset management company responsible for all world-wide

5    investments held and sold by Allianz Insurance.

6         18.    Additionally, over the next several months, as the result of Carimati's

7    introduction, McCloy facilitated introductions between Carimati and McCloy's

8    network of contacts including a number of German banks and David Stockard, one

9    of McCloy's business partners.

10                   **GINSGLOBAL AND CARIMATI EXECUTE THE**

11                   **MEMORANDUM OF UNDERSTANDING**

12        19.    In the fall and winter of 2007, as Carimati's successful  initial

13   marketing efforts revealed a strong interest and demand for the Hindsight Product,

14   Carimati and Ginsberg discussed entering a formal written contract along the terms

15   of their oral agreement that would provide Carimati exclusivity for the entire

16   European market.  Ginsberg informed Carimati that exclusivity would not be an

17   issue because GinsGlobal did not actively market the Hindsight Product in Europe

18   and did not have immediate plans or ability to do so.

19        20.    On January 9, 2008, Carimati and Ginsberg met in New York, and

20   executed the Memorandum of Understanding ("MOU") between GinsGlobal and

21   Carimati.  The MOU was drafted by GinsGlobal's attorneys, with some comments

22   from Carimati, and reflected the terms of the oral agreement.  Ginsberg expressly

23   warranted that he was authorized to enter the MOU on behalf of GinsGlobal.  A

24   true and correct copy of the MOU is attached hereto as Exhibit 1.  The MOU

25   includes the following terms:

26             a.    "Whereas GG[1] and AC are parties to a joint venture agreement

27

28   _____

[1] The MOU defines GinsGlobal as "GG" and Carimati as "AC."

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41365278.3                                    5

COMPLAINT

1   in terms of which AC's responsibility is to represent GG in marketing the Hindsight

2   indexed (including but not limited to principal protected) concept (hereinafter

3   referred to as "the product") within Europe (including but not limited to the UK,

4   Italy, Ireland, Germany, Austria, France, Spain, Belgium, Holland, Switzerland,

5   and Russia);

6          b.       "And Whereas GG shall enter into an equal fee sharing

7   arrangement with AC to remunerate him for any of these sales as a direct result of

8.  his marketing and distribution efforts of the said product;"

9          c.       "The parties hereby acknowledge and agree that this

10  arrangement will be a joint venture and a new company (Newco) will be

11  incorporated to represent the parties' interests in this joint venture;"

12         d.       "The parties hereby acknowledge and agree that an exclusivity

13  arrangement between them in relation to the clients and the distribution of the said

14  product is in order.  Neither party shall enter into any competitive agreements or

15  business transactions for the duration of this Agreement.  This exclusivity

16  arrangement shall remain in full force and effect for a period of five (5) years from

17  the date of this Agreement;"

18         e.       "GG and AC hereby acknowledge and agree that a variety of

19  Hindsight related products will be marketed by Newco;"

20         f.       "Newco's distribution efforts will be focused on both

21  institutional and retail channels, including but not limited to banks, insurance

22  companies, asset/fund managers and 3rd party distributors;"

23         g.       "The parties hereby acknowledge and agree that this

24  Memorandum of Understanding shall be binding upon them upon signature of each

25  of them."

26         21.    After signing the MOU, Carimati remained in New York and

27  continued meeting with contacts in the hedge fund and money management fields.

28  Ginsberg expressed his gratitude and excitement about the opportunities presented

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41365278.3                          6
                              COMPLAINT

1   by these foundational meetings in an email to Carimati.  On January 15, 2008,

2   Ginsberg wrote, "Just a short note of thanks for all your sterling efforts the past 10

3   days in NY.  Seems you are on a real roll and making some great inroads with

4   leading players in the hedge and money management fields."  A true and correct

5   copy of Ginsberg's January 15, 2008 email is attached hereto as Exhibit 2.

6   ## CARIMATI CONTINUES HIS MARKETING EFFORTS, AND

7   ## GINSGLOBAL AND CARIMATI EXPAND THE

8   ## GEOGRAPHIC SCOPE OF THEIR AGREEMENT

9       22.     Carimati spent the following months actively marketing the Hindsight

10  Product, and continuing to meet with executives and financial managers.  For

11  instance, Carimati and Ginsberg met with the directors of Carthesio, a Swiss-based

12  asset management firm, the CEO of Allianz Global Investors, the directors of Julius

13  Baer, and a managing partner of McKenzie & Co.  Carimati also met with a number

14  of other individuals who expressed interest marketing the Hindsight Product to their

15  contacts beyond his original European mandate, including the United States, the Far

16  East, the Middle East, and Latin America.

17      23.     Thus, Carimati's initial success in attracting potential customers and

18  distributors interested in the Hindsight Products revealed a greater opportunity for

19  Carimati to market and sell Hindsight Products than contemplated by Carimati and

20  GinsGlobal when they signed the MOU.  Accordingly, in or about February 2008,

21  Carimati and Ginsburg discussed the fact that Carimati was developing various

22  prospects beyond the scope of Carimati's original European mandate.  Ginsberg

23  agreed that GinsGlobal would respect the payment terms of the MOU for any

24  business generated by Carimati regardless of geographic location, and going

25  forward, all Hindsight Product business conducted by Carimati or the Defendants

26  would be conducted through their new joint venture company.  That agreement was

27  confirmed in a series of emails between Carimati and Ginsberg dated February 15,

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41365278.3

7

COMPLAINT

1  18, and 19 2008 (together, the "February Emails").  True and correct copies of

2  those emails are attached, respectively, as Exhibits 3 and 4.

3      24.  On February 15, 2008 Carimati wrote to Ginsberg, "As I mentioned, I

4  wanted to confirm with you GinsGlobal's intention to pass all Hindsight product

5  business through Hindsight Investments Group, regardless of geographic location.

6  Proceeds will be divided as agreed."  (*See* Ex. 3.)

7      25.  On February 18, 2008, Ginsberg wrote to Carimati, "Yes, we intend to

8  pass through all such hindsight business through Hindsight Investments – that has

9  been initiated by our joint efforts.  However, existing business such as AIG, South

10  Africa, US CD's or Taiwan that already produces hindsight monies for the past 5

11  years can clearly not be credited to your efforts.  It is easy to differentiate existing

12  versus new business initiatives so I don't foresee any problems. " (*See* Ex. 3.)

13      26.  On February 18, 2008 Carimati wrote back to Ginsberg, "I do not

14  expect to be paid on initiatives that are yours in any way (neither past, nor future).  I

15  did however understand that we would use the new company as the channel for

16  both your and my Hindsight business and then sort out the payout according to

17  what has been agreed. . . . Let me know if this a correct understanding of our talks,

18  as this is an important issue for me to make clear, not only for myself, but to clarify

19  things also for any current and future collaborators." (*See* Ex. 3.)

20      27.  On February 19, 2008 Ginsberg responded, "Yes, I agree with your

21  comments re splitting all future initiatives using Hindsight investment entity – no

22  problem.  I just wanted to ensure there was no misunderstandings either re past

23  business initiatives." (*See* Ex. 4.)

24      28.  Carimati and Ginsberg discussed drafting a new written agreement to

25  reflect the terms agreed to in the MOU and the February Emails.  Ginsberg

26  informed Carimati that he would have his lawyers prepare a draft for Carimati's

27  review.

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41365278.3

8

COMPLAINT

## CARIMATI FORMS "NEWCO," HINDSIGHT INVESTMENT GROUP SA

29. Pursuant to the terms of the MOU, beginning in February 2008 Carimati began the process of incorporating Hindsight Investment Group SA ("HIG") to conduct all Hindsight business. To account for GinsGlobal's existing business marketing and selling Hindsight Products, Ginsberg and Carimati agreed that all world-wide Hindsight Product sales would pass through HIG, and, while Carimati would own 50% of the shares of HIG, he would not participate in the earnings that were attributable exclusively to Ginsberg and GinsGlobal's earlier efforts. (*See* Exhibits 3 and 4.) Based upon Carimati's efforts, HIG opened offices in Lugano, Switzerland and a correspondent office in London, England.

30. In March 2008, Carimati made the initial capital investment of 100,000 Swiss Francs required under Swiss law to establish a new company. GinsGlobal was supposed to reimburse Carimati for half of this amount once Hindsight Investments Group was formed as a subsidiary of GinsGlobal. However, it never did so.

31. The formation of HIG was critical to the joint venture's long term plan. One of Carimati's and GinsGlobal's primary goals was to eliminate internatl competition by building a single company with a globally standardized brand – HIG. The purpose of this decision was to focus revenue growth under a single, easily identifiable, global brand, and to make HIG the focal point of all efforts in building a significant client and distributor portfolio. This was identified by both parties as the best way to concentrate the benefits of both Carimati's and GinsGlobal's efforts; in order to maximize the intrinsic value of both the company and the brand. This would greatly facilitate both product marketing and an eventual sale of the company. The agreement to form HIG and to pass all world-wide Hindsight-related business exclusively through HIG was paramount to accomplishing these goals.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41365278.3

9

COMPLAINT

1    32.    Conducting all Hindsight-related business through HIG, regardless of

2    whether it was generated solely through the direct efforts of Carimati or

3    GinsGlobal, or through their combined efforts, would increase the value of HIG to

4    the benefit of both joint venture partners.

5    33.    The value of HIG would also increase based upon the volume of

6    products licensed, sold, or renewed by HIG because Hindsight Products are

7    structured so that HIG would earn an upfront fee when each Hindsight product was

8    sold, as well as an additional, continuous stream of income from each product sold

9    or licensed until the product matured.

10   **IN MARCH 2008, GINSBERG AND CARMATI EMBARK UPON A**

11   **SUCCESSFUL MARKETING TRIP TO EUROPE**

12   34.    In March 2008, Ginsberg and Carimati traveled together to meet with

13   some of Carimati's contacts in Italy and Germany.  The meetings were a success, as

14   the firms and individuals that Carimati and Ginsberg met with were impressed by

15   the Hindsight Product concept and were eager to investigate it further for potential

16   marketing and sale to their clients.

17   35.    At the conclusion of their trip, Ginsberg wrote to Carimati, "Your

18   focused effort and determination is impressive.  With our new product lines along

19   with the perfect storm right now I know we will turn our new venture into a success

20   shortly."  A true and correct copy of Ginsberg's March 15, 2008 email is attached

21   hereto as Exhibit 5.

22   **McCLOY BEGINS HIS EFFORTS TO OUST CARIMATI FROM HIG**

23   36.    During their trip to Europe, Carimati and Ginsberg met with McCloy

24   to discuss his compensation as a member of HIG's Board of Advisors.  McCloy

25   expressed his dissatisfaction with the terms that had been proposed, and requested

26   an equity stake not only in HIG, but in GinsGlobal as well.  This shocked both

27   Carimati and Ginsberg, and Ginsberg rejected the request.

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41365278.3

COMPLAINT

37.     From this point on, Carimati is informed and believes and on that basis alleges, McCloy began an effort to create a rift between Carimati and Ginsberg. Carimati is informed and believes, and on that basis alleges, that McCloy was dissatisfied with the amount of fees he would earn for his role as a member of HIG's Board of Advisors, and was jealous of Carimati's joint venture agreement with GinsGlobal.  Accordingly, McCloy launched a surreptitious initiative to disparage Carimati's performance as a Hindsight representative to Ginsberg in hopes of replacing Carimati and earning greater fees for himself.

38.     For instance, in early April 2008, McCloy informed Ginsberg and Carimati that certain of his contacts would only deal directly with Ginsberg because Carimati supposedly was not responsive to the questions asked of him.  This was an artifice designed to drive a wedge between Carimati and GinsGlobal.  When Carimati initially discussed this issue with Ginsberg, Ginsberg told Carimati not to worry about it and not to engage McCloy on the subject, as Ginsberg did not believe it was an issue.

39.     In fact, Carimati's dealings with the individuals identified by McCloy had progressed similarly in all material respects to his dealings with other contacts, and some of the questions required disclosure of proprietary information which Carimati was unwilling to disclose until signed exclusive license agreements were in place.

40.     However, McCloy persisted.  McCloy's insistence that certain contacts deal only with Ginsberg required Ginsberg to be more involved in the day-to-day operations of HIG, which were to be Carimati's responsibility, and interfered with Ginsberg's other obligations to GinsGlobal.  Among other impacts, this caused delays in getting contracts and materials to HIG contacts.  Carimati explained to McCloy that Ginsberg was too busy to focus only on HIG, which is Carimati's day-to-day job, and could not respond to McCloy's demands as quickly as would Carimati.

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

41365278.3

11

COMPLAINT

41.     On April 16, 2008, Carimati arranged a series of meetings in Washington, D.C. with Ginsberg, McCloy, and Stockard.  The purpose of the meetings was to introduce HIG to a group of Stockard's friends and business associates, including lawyers, lobbyists, asset managers, and other well-connected individuals, who were to form part of HIG's distribution network.  At these meetings, Carimati delivered a short introduction about the history of HIG and the market at the beginning of each session before yielding the floor to Ginsberg to describe the Hindsight Product.

42.     At the meeting, McCloy's efforts to interfere with the relationship between Carimati and Ginsberg continued.  Although Carimati played a limited role in presenting the Hindsight Products at these meetings, McCloy sent Ginsberg a private email criticizing Carimati's performance.   A true and correct copy of McCloy's email to Ginsberg, which Carimati received from Ginsberg is attached hereto as Exhibit 6.  Again, Ginsberg reassured Carimati that he did not share McCloy's concerns, and that they would not affect the relationship between Carimati and the Defendants.

## GINSGLOBAL ATTEMPTS TO RENEGOTIATE ITS AGREEMENT WITH CARIMATI

43.     On May 9, 2008, Carimati received the first draft of the proposed revised agreement between Carimati and GinsGlobal (the "May 9 Draft").  The May 9 Draft differed dramatically and materially from the MOU and Carimati's and Ginsberg's agreement described in the February Emails.  In particular, rather than reflecting the parties' existing written agreement, the May 9 Draft attempted to completely renegotiate the terms all to the advantage of GinsGlobal and to the detriment of Carimati.  For instance, the May 9 Draft:

a.     Required Carimati to give up his exclusive rights to the UK market, which was the largest potential market in Europe;

b.     Failed to reflect Carimati's rights in the United States and other

1    locations world-wide, as agreed in the February Emails;

2          c.      Reduced Carimati's exclusivity from five (5) years to (3) years

3    and proposed a minimum financial threshold to keep the agreement in place where

4    none existed under the MOU;

5          d.      Renounced the existence of the joint venture, whereas the MOU

6    expressly acknowledged a joint venture between Carimati and GinsGlobal;

7          e.      Purported to eliminate Carimati's ability to market HIG through

8    the network of sub-agents and advisors after Carimati had spent several months

9    recruiting, nurturing, and developing that network and developing the Board of

10    Advisors;

11          f.      Did not commit to passing all global Hindsight Product business

12    through HIG as Carimati and Ginsberg agreed to do in the February Emails.

13    A true and correct copy of the May 9 Draft is attached hereto as Exhibit 7.

14      44.     Carimati informed Ginsberg that the changes proposed in the May 9

15    Draft were not acceptable, as they were contrary to the parties' existing agreement.

16    Ginsberg agreed to review the MOU and prepare a new draft agreement.

17      45.     On May 21, 2008, Ginsberg forwarded a second draft agreement to

18    Carimati (the "May 21 Draft"). A true and correct copy of the May 21 Draft is

19    attached hereto as Exhibit 8. The May 21 Draft simply repackaged the

20    unacceptable terms and elements of the May 9 Draft. In a May 22, 2008 email,

21    Ginsberg blamed the new terms on his lawyers and GinsGlobal's board members,

22    who objected to GinsGlobal allowing Carimati to maintain a 50% interest in HIG.

23    Despite his previous representations to the contrary, and the existing agreement,

24    Ginsberg claimed that he did not have authority to grant Carimati a 50% share in all

25    global revenue. A true and correct copy of Ginsberg's May 22, 2008 email is

26    attached hereto as Exhibit 9.

27      46.     On May 22, 2008, Carimati wrote to Ginsberg to explain that the May

28    22 Draft also failed to reflect the parties' existing agreement. Carimati explained

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41365278.3

13

1   again that any new written agreement between Carimati and GinsGlobal must

2   embody their existing agreement and not rewrite it to Carimati's detriment.  A true

3   and correct copy of Carimati's May 22, 2008 email is attached hereto as Exhibit 10.

4        47.    On May 23, 2008, Carimati wrote to McCloy to explain that HIG is

5   owned jointly by Carimati and GinsGlobal, and McCloy's secretive

6   communications with Ginsberg has caused "major tension, confusion, and delays"

7   within HIG.  A true and correct copy of Carimati's May 3, 2008 email is attached

8   hereto as Exhibit 11.

9        48.    On May 29, 2008, Ginsberg wrote to Carimati terminating the joint

10   venture between Carimati and GinsGlobal.  A true and correct copy of Ginsberg's

11   email dated May 29, 2008 is attached hereto as Exhibit 12.

12        49.    Later on May 29, 2008, McCloy wrote to Carimati and confirmed that

13   Ginsberg had asked McCloy to remain involved with HIG.  A true and correct copy

14   of McCloy's May 29, 2008 email is attached hereto as Exhibit 13.

15        50.    Carimati is informed and believes, and on that basis alleges that

16   GinsGlobal has continued to market and sell Hindsight Products world-wide,

17   including to the individuals and entities to which GinsGlobal was introduced to

18   through Carimati's efforts.

19        51.    GinsGlobal's termination of the joint venture after only a few months

20   has damaged Carimati's reputation in the financial community.  In executing the

21   "top-down" approach, Carimati personally contacted dozens of high-level managers

22   and directors of financial services firms world-wide.  When these contacts began

23   contacting Carimati in June 2008 to arrange follow-up meetings or to license or

24   purchase Hindsight Products, Carimati was forced to turn them away.  Carimati's

25   ultimate inability to deliver the promised product has damaged his relationship with

26   these individuals.  Thus, Carimati faces great difficulty regaining the trust of these

27   individuals in future business dealings.

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41365278.3

14

COMPLAINT

# FIRST CAUSE OF ACTION

## (Breach of Contract against GinsGlobal)

52.     Carimati realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 51 above.

53.     Carimati and GinsGlobal executed the MOU on January 9, 2009.  The MOU is an enforceable agreement between Carimati and GinsGlobal.

54.     The February Emails constitute an agreement between Carimati and GinsGlobal that GinsGlobal would respect the payment terms of the MOU for any business generated by Carimati regardless of geographic location, and any and all Hindsight Product-related business world-wide would be conducted exclusively by HIG.

55.     GinsGlobal breached the MOU and the parties' February agreement by, among other things, terminating the joint venture without cause, failing to make its share of the capital investment in HIG, failing to conduct all Hindsight Product-related business through HIG, and failing and refusing to pay Carimati any of the revenues derived from the marketing and sale of Hindsight Products world-wide since January 9, 2008.

56.     Carimati has performed each of his obligations and promises under the agreements, and has satisfied any and all conditions to GinsGlobal's performance except insofar as such obligations, promises, or conditions have been excused by GinsGlobal's conduct as set forth herein.

57.     As a direct and proximate cause of GinsGlobal's breach of contract, Carimati has been damaged as alleged herein in an amount to be proven at trial, but in any event, in an amount in excess of $75,000.

**SECOND CAUSE OF ACTION**

**(Breach of Implied Covenant of Good Faith**

**and Fair Dealing against GinsGlobal)**

58.     Carimati realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 57 above.

59.     Implied in the agreement between Carimati and GinsGlobal was a covenant of good faith and fair dealing whereby GinsGlobal covenanted that it would, in good faith and in the exercise of fair dealing, deal with Carimati fairly and honestly and would not do anything to deprive Carimati of the benefits of the agreements between Carimati and GinsGlobal.

60.     GinsGlobal breached the covenant of good faith and fair dealing owed to Carimati by, among other things, failing to make its share of the capital investment in HIG, failing to conduct all Hindsight Product-related business exclusively through HIG, allowing McCloy to undermine Carimati's position as joint venturer, terminating the joint venture, and failing and refusing to pay Carimati any of the revenues derived from the marketing and sale of Hindsight Products since January 9, 2008.

61.     As a direct and proximate result of GinsGlobal's breach of the covenant of good faith and fair dealing, Carimati has been damaged as alleged herein in an amount to be proven at trial, but in any event, in an amount in excess of $75,000.

**THIRD CAUSE OF ACTION**

**(Breach of Fiduciary Duty against GinsGlobal)**

62.     Carimati realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 61 above.

63.     As parties to a joint venture agreement, GinsGlobal owed Carimati a fiduciary duty to deal with Carimati fairly and honestly and to do nothing to deprive Carimati of the benefits of their joint venture agreement.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41365278.3                                          16

COMPLAINT

64.     GinsGlobal breached its fiduciary duty to Carimati by, among other things, failing to conduct all Hindsight business exclusively through HIG, failing to make its capital investment in HIG, failing to pay Carimati his profits under the joint venture, allowing McCloy to undermine Carimati's position as joint venturer, and terminating the parties' joint venture agreement.

65.     As a direct and proximate result of GinsGlobal's breach of fiduciary duty, Carimati has been deprived of the benefits of the joint venture and has suffered damage to his reputation.  Carimati has been damaged as alleged herein in an amount to be proven at trial, but in any event, in an amount in excess of $75,000.

66.     Carimati is informed and believes, and on that basis alleges, that Ginsberg's and GinsGlobal's acts as alleged above were fraudulent and were done with callous, willful, and with such conscious disregard for Carimati's rights that Carimati is therefore entitled to an award of exemplary or punitive damages against the defendants in an amount to be proven at trial.

67.     Carimati is entitled to preliminary and permanent injunctive relief enjoining GinsGlobal from further breaches of its fiduciary duty to Carimati.

## FOURTH CAUSE OF ACTION

### (Constructive Trust against GinsGlobal and Ginsberg)

68.     Carimati realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 67 above.

69.     Carimati has demanded that GinsGlobal and Ginsberg pay him his share of the revenues derived from the marketing and sale of Hindsight Products world-wide since January 9, 2008, including all income streams and subsequent renewals that he is entitled to under the parties' agreement.  GinsGlobal and Ginsberg have refused to do so.

70.     GinsGlobal and Ginsberg have wrongfully retained possession and control of 100% of the revenues of all Hindsight Product related business despite the joint venture agreement, MOU, and the February Emails between Carimati and

1 GinsGlobal.  By such act, GinsGlobal and Ginsberg have become the involuntary

2 trustees of a constructive trust in favor of, and for the benefit of, Carimati, and

3 Carimati is entitled to the imposition of a constructive trust upon 50% of all

4 income, revenues, and profits derived from the marketing and sale of Hindsight

5 Products world-wide since January 9, 2008 that he is entitled to, including all

6 income streams and subsequent renewals.

7 **FIFTH CAUSE OF ACTION**

8 **(Fraud against GinsGlobal and Ginsberg)**

9     71.    Carimati realleges and incorporates by reference each and every

10 allegation set forth in paragraphs 1 through 70 above.

11     72.    In order to induce Carimati to enter the joint venture agreement with

12 GinsGlobal, Ginsberg and GinsGlobal promised Carimati a five year exclusive

13 right to market and sell Hindsight Products in Europe, and, after February 2008,

14 world-wide.  Ginsberg and GinsGlobal further promised to pass all Hindsight

15 Products-related business exclusively through HIG.  Ginsberg and GinsGlobal also

16 promised Carimati that he would be compensated for his efforts, agreeing that

17 Carimati would receive a 50% interest in HIG and in all Hindsight Products related

18 business world-wide commenced after February 2008.  Ginsberg and GinsGlobal

19 made these promises to induce Carimati to market and sell the Hindsight Product to

20 his network of contacts in the financial and insurance industries.

21     73.    Ginsberg also represented that he had the authority to negotiate and

22 enter into the MOU on behalf of GinsGlobal.  Ginsberg ultimately denied having

23 the authority to agree to the terms in the MOU and February Emails.

24     74.    Carimati is informed and believes, and on that basis alleges, that

25 Defendants concealed their true plans which were to exploit Carimati's contacts for

26 their own financial advantage and to terminate their agreement with Carimati after

27 his efforts established the potential success of HIG and global Hindsight Product

28 sales.  Carimati is informed and believes, and on that basis alleges, that Defendants

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES
41365278.3
18
COMPLAINT

1   then decided that it would be more advantageous to them to conduct Hindsight

2   Products business through GinsGlobal rather than through HIG, in which

3   GinsGlobal would only hold a 50% interest.

4        75.   Carimati is informed and believes, and on that basis alleges, that when

5   Defendants made these material omissions or representations to Carimati, they

6   knew them to be false and made the representations with the intention to deceive

7   and defraud Carimati and to induce Carimati to act in reliance on their

8   representations in the manner herein alleged, or with the expectation that Carimati

9   would so act.

10       76.   At the time Defendants made these representations, Carimati was

11  ignorant of their falsity and reasonably believed them to be true.  In reliance upon

12  these representations, beginning in or around July 2007, Carimati investigated and

13  conducted due diligence regarding the Hindsight Product, and beginning in or

14  around December 2007, worked exclusively to market the Hindsight Product and

15  represent HIG until GinsGlobal terminated the joint venture in May 2008.

16       77.   Carimati reasonably relied upon Defendants' promises and

17  representations by, among other things, undertaking extensive efforts to market and

18  sell the Hindsight Products and successfully introduced Defendants to numerous

19  contacts in the United States and Europe with global connections.

20       78.   As a direct and proximate cause of Defendants' fraud, Carimati has

21  been damaged as alleged herein in an amount to be proven at trial, but in any event,

22  in an amount in excess of $75,000.

23       79.   Carimati is informed and believes, and on that basis alleges, that

24  Ginsberg's and GinsGlobal's acts as alleged above were fraudulent and were done

25  with callous, willful, and with such conscious disregard for Carimati's rights that

26  Carimati is therefore entitled to an award of exemplary or punitive damages against

27  the defendants in an amount to be proven at trial.

28

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

41365278.3                                    19

COMPLAINT

## SIXTH CAUSE OF ACTION

### (Negligent Misrepresentation against GinsGlobal and Ginsberg)

80.     Carimati realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 79 above.

81.     As described above, in order to induce Carimati to enter the joint venture agreement with GinsGlobal, Defendants negligently concealed and misrepresented material facts to Carimati.

82.     When Defendants made these representations to Carimati, they had no reasonable ground for believing them to be true.  At all relevant times, Defendants knew that Carimati was unaware of the true facts.

83.     In justifiable reliance on Defendants' misrepresentations of material facts, Carimati, among other things, undertook extensive efforts to market and sell the Hindsight Products and successfully introduced Defendants to numerous contacts in the United States and Europe with global connections.

84.     Carimati is informed and believes, and on that basis alleges, that Defendants concealed their true plans which were to exploit Carimati's contacts for their own financial advantage and to terminate their agreement with Carimati after he had made the promised introductions.  Ginsberg ultimately denied having the authority to agree to the terms in the MOU and February Emails.

85.     Carimati is informed and believes, and on that basis alleges, that when Defendants made these representations to Carimati, they knew them to be false and made the representations with the intention to deceive and defraud Carimati and to induce Carimati to act in reliance on their representations in the manner herein alleged, or with the expectation that Carimati would so act.

86.     At the time Defendants made these representations, Carimati was ignorant of their falsity and reasonably believe them to be true.  In reliance upon these representations, beginning in or around July 2007, Carimati investigated and conducted due diligence regarding the Hindsight Product, and beginning in or

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41365278.3                                    20

COMPLAINT

1    around December 2007, worked exclusively to market the Hindsight Product and

2    represent HIG until GinsGlobal terminated the joint venture in May 2008.

3         87.    Carimati reasonably relied upon Defendants' promises and

4    representations.

5         88.    As a direct and proximate cause of Defendants' misrepresentations,

6    Carimati has been damaged as alleged herein in an amount to be proven at trial, but

7    in any event, in an amount in excess of $75,000.

8                      **SEVENTH CAUSE OF ACTION**

9            **(Unjust Enrichment against GinsGlobal and Ginsberg)**

10        89.    Carimati realleges and incorporates by reference each and every

11   allegation set forth in paragraphs 1 through 88 above.

12        90.    As alleged above, Carimati and GinsGlobal are parties to an agreement

13   which provides, *inter alia*, that Carimati and GinsGlobal are partners in a joint

14   venture to market and sell Hindsight Products world-wide, to form HIG with each

15   holding a 50% interest, and that Carimati and GinsGlobal would equally share the

16   profits derived from their joint venture.

17        91.    As alleged above, GinsGlobal and Ginsberg received a benefit when

18   Carimati engaged in a world-wide effort to market, sell, and license Hindsight

19   Products.

20        92.    It would be unjust to allow GinsGlobal and Ginsberg to retain the

21   entire benefit of Carimati's efforts and to deprive him of the revenues derived from

22   Hindsight Products in light of GinsGlobal's premature termination of the joint

23   venture without cause.

24        93.    As a result, Carimati is entitled to an award of damages in an amount

25   to be proven at trial.

26        94.    In the alternative, Carimati is entitled to a constructive trust over one-

27   half of the revenues derived from the sale of Hindsight Products, or subsequent

28   extensions and variations thereof, during the exclusive five year term set forth in

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41365278.3                          21

                              COMPLAINT

the MOU, and in perpetuity for all clients obtained during the five-year term who subsequently renew, as involuntary trustees of a constructive trust in favor of, and for the benefit for, Carimati.

## EIGHTH CAUSE OF ACTION

### (Accounting against GinsGlobal and Ginsberg)

95.     Carimati realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 94 above.

96.     As alleged above, Carimati acquired an interest in all revenues derived from the sale, licensing, and renewals of Hindsight Products after January 9, 2008 and in perpetuity as a result of his agreement with GinsGlobal.

97.     Despite the parties' agreement, Carimati is informed and believes, and on that basis alleges, that GinsGlobal and Ginsberg have retained all revenues and profits from the sale of Hindsight Products.

98.     Carimati has demanded an accounting by GinsGlobal and Ginsberg of all revenues and profits derived from the sales of Hindsight Products since January 9, 2008, but GinsGlobal and Ginsberg have failed and refused, and continue to fail and refuse to render a true and correct accounting.

## PRAYER FOR RELIEF

WHEREFORE, Carimati seeks judgment as follows:

ON THE FIRST CAUSE OF ACTION

1.     For damages in an amount to be proven at trial;

ON THE SECOND CAUSE OF ACTION

2.     For damages in an amount to be proven at trial;

ON THE THIRD CAUSE OF ACTION

3.     For damages in an  amount to be proven at trial;

4.     For punitive damages in an amount to be proven at trial;

1       5.     For preliminary and permanent injunctive relief enjoining GinsGlobal

2    from further breaches of its fiduciary duty to Carimati;

3        ON THE FOURTH CAUSE OF ACTION

4       6.     For a determination that GinsGlobal and Ginsberg hold one-half of the

5    revenues derived from the sale of Hindsight Products, and subsequent extensions

6    and variations thereof during the exclusive five year term set forth in the MOU, and

7    in perpetuity for all clients obtained during the five-year term who subsequently

8    renew, as involuntary trustees of a constructive trust in favor of, and for the benefit

9    for, Carimati, and for an order requiring GinsGlobal and Ginsberg to transfer those

10   profits to Carimati to which he is entitled;

11       ON THE FIFTH CAUSE OF ACTION

12      7.     For general damages in an amount to be proven at trial;

13      8.     For punitive damages in an amount to be proven at trial;

14       ON THE SIXTH CAUSE OF ACTION

15      9.     For general damages in an amount to be proven at trial;

16     10.    For punitive damages in an amount to be proven at trial;

17      ON THE SEVENTH CAUSE OF ACTION

18     11.    For damages in amount to be proven at trial;

19     12.    For a determination that GinsGlobal and Ginsberg hold one-half of the

20   revenues derived from the sale of Hindsight Products, and subsequent extensions

21   and variations thereof during the exclusive five year term set forth in the MOU, and

22   in perpetuity for all clients obtained during the five-year term who subsequently

23   renew, as involuntary trustees of a constructive trust in favor of, and for the benefit

24   for, Carimati, and for an order requiring GinsGlobal and Ginsberg to transfer those

25   profits to Carimati to which he is entitled;

26      ON THE EIGHTH CAUSE OF ACTION

27     13.    For an accounting between Plaintiff and GinsGlobal and Ginsberg

28   regarding the revenues and profits derived form the sale of Hindsight Products;

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41365278.3                 23

COMPLAINT

1    14.    For payment to Carimati of his one-half share of all profits received by

2    GinsGlobal and Ginsberg from the sale of Hindsight Products to which Carimati is

3    entitled;

4    <u>ON ALL CAUSES OF ACTION</u>

5    15.    For pre-judgment interest at the legal rate for all amounts owed;

6    16.    For costs and expenses of suit incurred herein; and

7    17.    For such other and further relief as the Court may deem just and

8    proper.

9

10   Dated:    April 6, 2009          Manatt, Phelps & Phillips, LLP
11                                    Stanley W. Levy
                                      Craig J. de Recat
12                                    Craig S. Rutenberg

13

14                                    By: _____
                                          Craig S. Rutenberg
15                                        *Attorneys for Plaintiff*
                                          ASCANIO CARIMATI DI
16                                        CARIMATE

17

18

19

20

21

22

23

24

25

26

27

28

41365278.3                          24

                                COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2    Plaintiff Ascanio Carimati de Carimate hereby demands a trial by jury.

3

4    Dated:    April 6, 2009                    Manatt, Phelps & Phillips, LLP
                                                Stanley W. Levy
5                                               Craig J. de Recat
                                                Craig S. Rutenberg
6

7                                               By: _____
                                                Craig S. Rutenberg
8                                               *Attorneys for Plaintiff*
                                                ASCANIO CARIMATI DI
9                                               CARIMATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41365278.3                                      25

COMPLAINT

# EXHIBIT 1



| Tel: +1 310 432 4374    Fax: +1 310 289 8186 |
| Email – ag@ginsglobal.com |

1880 Century Park East

Suite # 200

Los Angeles

CA 90067-1600

---

**MEMORANDUM OF UNDERSTANDING**

entered into between

GinsGlobal Index Funds ("GG")

and

Ascanio Carimati di Carimate (" AC")

(A)     **WHEREAS** GG and AC are parties to a joint venture agreement in terms of which AC's responsibility is to represent GG in marketing the Hindsight indexed (including but not limited to principal protected) concept (hereinafter referred to as "the product") within Europe (including but not limited to the UK, Italy, Ireland, Germany, Austria, France, Spain, Belgium, Holland, Switzerland, and Russia)

(B)     **AND WHEREAS** GG shall enter into an equal fee sharing arrangement with AC to remunerate him for any of these sales as a direct result of his marketing and distribution efforts of the said product.

**WHEREBY THE PARTIES AGREE AS FOLLOWS:**

1.     The parties hereby acknowledge and agree that this arrangement will be a joint venture and a new company (Newco) will be incorporated to represent the parties' interests in this joint venture.

2.     The parties hereby acknowledge and agree that AC will only be remunerated for any of the net fees he generates from his sales and distribution efforts in Europe.

3.     The parties hereby acknowledge and agree that an exclusivity arrangement between them in relation to the clients and the distribution of the said product is in order.  Neither party shall enter into any competitive agreements or business transactions for the duration of this Agreement. This exclusivity arrangement shall remain in full force and effect for a period of five (5) years from the date of this Agreement.

4.     GG and AC hereby acknowledge and agree that a variety of Hindsight related products will be marketed by Newco.

5.     Newco's distribution efforts will be focused on both institutional and retail channels, including but not limited to banks, insurance companies, asset/ fund managers and 3rd party distributors.

6.     The parties hereby acknowledge and agree that this Memorandum of Understanding shall be binding upon them upon signature by each of them.

7.     This Memorandum of Understanding may be executed in counter-parts all of which shall constitute one and the same agreement and shall be as effective as though both parties had signed the same document.

8.     This Agreement shall be construed, governed and interpreted in accordance with the laws of the Delaware.



Signed at _New York_ on this ___09th___ day of _January_ 2008.

As witnesses:                              For GG:

1 _____                      _____

2 _____                      who warrants that he / she is duly authorised thereto


Signed at _New York_ on this ___09th___ day of _January_ 2008.

As witnesses:                              For AC:

1 _____                      _____

2 _____                      who warrants that he / she is duly authorised thereto

# EXHIBIT 2

**From:** Anthony Ginsberg [mailto:ag@ginsglobal.com]
**Sent:** Tuesday, January 15, 2008 9:03 AM
**To:** acarimati@hindsight-investments.com
**Subject:** RE: Thank You

Hi Ascanio

Just a short note of thanks for all your sterling efforts the past 10 days in NY.  Seems you are on a real roll and making some great inroads with leading players in the hedge and money management fields.

I hope we can hook up in Germany/Switzerland next month although my schedule is a bit tight.  RE Carthesio will be interesting to see what response you get from them re the new angle we agreed on where they are not treated as equity partner (shareholder).

I will do my best to keep in touch on a frequent basis over the next 2-3 weeks ahead of my travels to the Middle East.

Again many thanks for all your efforts and hard work - truly is exciting!  I see Andrew Smith responded almost immediately to your e-mail - which is also a great sign!

Fly safely back to London & Milan.

Kind regards & Ciao,

Anthony

# EXHIBIT 3

**From:** Ascanio Carimati di Carimate [mailto:acarimati@hindsight-investments.com]
**Sent:** Friday, February 15, 2008 3:57 PM
**To:** Anthony Ginsberg
**Subject:** Hindsight Investments global business

Dear Anthony,

As mentioned, I wanted to confirm with you GinsGlobal's intention to pass all Hindsight product business through Hindsight Investments Group, regardless of geographical location.  Proceeds will be divided as agreed.

Thanks so much!

Sincerely,

Ascanio


Ascanio Carimati di Carimate
President
Hindsight Investments Group Ltd.


This e-mail message, including any attachments, is intended only for the persons to whom it is addressed, and may contain confidential information. It is not intended as an offer or solicitation for the purchase or sale of any financial instrument. Any use, distribution, modification, copying or disclosure by any other person is strictly prohibited. If you have received this message in error please notify the sender by return e-mail and delete this message from your computer. Any data or views contained herein is based upon information available to us at this date, and is subject to change without notice, and is not warranted as to completeness or accuracy by Hindsight Investments Group Ltd or its affiliates. Any comments or statements made herein do not necessarily reflect those of Hindsight Investments Group Ltd or its affiliates.


**From:** Anthony Ginsberg [mailto:ag@ginsglobal.com]
**Sent:** Monday, February 18, 2008 8:41 PM
**To:** Ascanio Carimati di Carimate
**Subject:** RE: Hindsight Investments global business

Hi Ascanio

Hope you have had a good time up in VT.  Good luck with ex McKinsey guy tomorrow.  I appreciate al your effort in staying on 4 days to see him.

Yes we intend to pass through all such hindsight business through Hindsight Investments - that has been initiated through our joint efforts.

However existing business such as AIG, South Africa, US CD's or Taiwan that already produces hindsight monies for the past 5 years can clearly not be credited to your efforts.  It is easy to differentiate existing versus new business initiatives so I don't foresee any problem.

Clearly Hindsight Investment should be the recipient of all new business inflows that result from our joint initiative - between ourselves. Am happy to discuss this further if you have concerns.

Kind regards,

Anthony

Anthony Ginsberg CPA
Managing Director

## GinsGlobal Index Funds Ltd
**www.ginsglobal.com**
Tel:   (310) 432 4374 (w)
        (310) 801 4974 (cell)
Fax:  (310) 289 8186

This message, including any attachments, is confidential, privileged and may be exempt from disclosure under applicable law. It is intended only for the above-named recipient(s) or entity and the employee(s) or agent(s) responsible for delivering this message to the intended recipient(s) or entity. If this message is received in error, please delete this message from your system and notify the sender by replying to the electronic mail, adding the Subject Line "This message was received in error. The message and any attachments were deleted.". Any unauthorized use, dissemination, distribution, copying or disclosure of this message is strictly prohibited.



---

**From:** Ascanio Carimati di Carimate [mailto:acarimati@hindsight-investments.com]
**Sent:** Monday, February 18, 2008 3:56 PM
**To:** Anthony Ginsberg
**Subject:** RE: Hindsight Investments global business

Dear Anthony,

Ciao! I did indeed enjoy my time in Vermont, though it was a little on the tranquil side.

Did you get a chance to catch your breath? I hope so!

My understanding of our discussions is that we would pass all future Hindsight business (including renewals on past business, but understandably excluding AIG as it is better to let sleeping dogs lie) in order to build the "Hindsight" brand and have a company that would have a strong intrinsic value in the future.

I hope you did not misunderstand my reasoning behind my request:  I do not expect to be paid on initiatives that are yours in any way (neither past, nor future).

I did however understand that we would use the new company as the channel for both your and my Hindsight business and then sort the payout according to what has been agreed.  I remember discussing that sorting out the appropriate payments would not be an issue for you, and you were in agreement that this was not only the best way to build the brand, but to build value in the company if we one day decided to entertain an exit strategy.

Let me know if this is a correct understanding of our talks, as this is an important issue for me to make clear, not only for myself, but to clarify things also for any current and future collaborators.

I really believe that with your brilliant product and dedicated brand management (obviously in addition to very strong sales efforts) we will be able to build something genuinely successful!  I am staking my future on this!

I will most definitely get in touch with you after my meeting tomorrow, but please send me an answer to the above before, if you can.

All my best,

Ascanio

P.S.

Please note that I expected making any financial movements on any accounts pertaining to Hindsight Investments Group contingent on a second, joint signature from you:  I realize that our relationship is new and this would be totally normal.  Also, I have no problems limiting my authority as president of the firm to "ordinary" powers (not "extraordinary" powers – specific terms used in Europe during the incorporation process) …. I can better explain this difference to you when we next speak.  If it is an issue, we can discuss my  making claim to a different title within the company – I am interested in the final results that I know this company can bring.


Ascanio Carimati di Carimate
President
Hindsight Investments Group Ltd.

This e-mail message, including any attachments, is intended only for the persons to whom it is addressed, and may contain confidential information. It is not intended as an offer or solicitation for the purchase or sale of any financial instrument. Any use, distribution, modification, copying or disclosure by any other person is strictly prohibited. If you have received this message in error please notify the sender by return e-mail and delete this message from your computer. Any data or views contained herein is based upon information available to us at this date, and is subject to change without notice, and is not warranted as to completeness or accuracy by Hindsight Investments Group Ltd or its affiliates. Any comments or statements made herein do not necessarily reflect those of Hindsight Investments Group Ltd or its affiliates.

# EXHIBIT 4

**From:** Anthony Ginsberg [mailto:ag@ginsglobal.com]
**Sent:** Tuesday, February 19, 2008 6:17 AM
**To:** Ascanio Carimati di Carimate
**Subject:** RE: Hindsight Investments global business

Hi Ascanio

Yes I agree with your comments re splitting all future initiatives using Hindsight Investment entity - no problem. I just wanted to ensure there was no misunderstandings either repast business initiatives!

Re David Stockard and Templeton - I'm not sure if there is much to be done with them frankly as they run all their own money - but always worth exploring!  Don't expect anything though!

Re the various legal points for Stockard - all seems in order. I can get our legal counsel to draft into a basic agreement if u wish - as some of the wording needs tightening up... lets chat on Tuesday.

Good luck re Tuesday meeting with Harvard.

Kind regards,

Anthony


Anthony Ginsberg CPA
Managing Director

## GinsGlobal Index Funds Ltd
**www.ginsglobal.com**
Tel:   (310) 432 4374 (w)
        (310) 801 4974 (cell)
Fax:  (310) 289 8186

This message, including any attachments, is confidential, privileged and may be exempt from disclosure under applicable law. It is intended only for the above-named recipient(s) or entity and the employee(s) or agent(s) responsible for delivering this message to the intended recipient(s) or entity. If this message is received in error, please delete this message from your system and notify the sender by replying to the electronic mail, adding the Subject Line "This message was received in error. The message and any attachments were deleted.". Any unauthorized use, dissemination, distribution, copying or disclosure of this message is strictly prohibited.



# EXHIBIT 5

-----Original Message-----
From: Anthony Ginsberg [mailto:ag@ginsglobal.com]
Sent: Saturday, March 15, 2008 4:21 AM
To: acarimati@msn.com
Cc: Lisa Segall
Subject: Thanks

Ascanio

I enjoyed the past 5 days with you and am definately encouraged and feel we are on the right track.

Your focused effort and determination is impressive.  With our new product lines along with the perfect storm right now I know we will turn our new venture into a success shortly.

Have a nice weekend with the family.

Ciao
Anthony
Anthony Ginsberg

# EXHIBIT 6

From: Anthony Ginsberg <ag@ginsglobal.com>
Sent: Wednesday, April 16, 2008 20:29
To: Ascanio Carimati di Carimate <acarimati@hindsight-investments.com>
Subject: Fw:

Hi Ascanio
I appreciate all your effort energy and commitment so don't let the comments below piss you off too much.
We can always improve so let's just take the good suggestions and use these.
Good luck in NY rest of the week. Will sort agreement out ASAP.
Ants
Sent from Blackberry

----- Original Message -----
From: McCloy, John J. <JMcCLoy@gravitastechnology.com>
To: Anthony Ginsberg
Sent: Wed Apr 16 11:11:30 2008

Dear Anthony
My impression is that the sessions in Washington went well. My recommendations are:
1. Keep the presentation shorter;
2. Hit the five, six or seven critical points;
3. Ask for questions.
Most of the types you will persuade are knowledgable people. Those who are not will need a totally different presentation. A good example is George Dewey but he will never make more than an introduction and not an in depth presentation.
After listening I would strongly urge having a professional presenter. Ascanio is not that person. He over-talks, repeats and emphasizes the obvious far too much. You will have noticed that every question was directed to you.
He is enthusiastic and very bright but his form of presentation will put a lot of people to sleep.
How we address this issue I am not sure but it needs to be.
If you noticed David took what Ascanio said and cut to the chase and gave in two minutes or less what Ascanio took much to long to express. Listeners will get lost in all the extraneous comment and might miss the bullet points.
I don't want you to think I don't admire Ascanio as that is certainly not the case but as an "insider" I want to be sure that we put our best foot forward to insure the greatest success.
I would urge you to talk to David directly and get his feedback. He will have done the rounds with his colleagues and give you the collective feedback.
Sorry for going on so long. Thanks for your time.
John

**From:** Anthony Ginsberg [mailto:ag@ginsglobal.com]
**Sent:** Sunday, April 20, 2008 9:34 PM
**To:** Ascanio Carimati di Carimate
**Subject:** RE: Our call

Ascanio

I look forward to speaking to you on Monday - good luck with your meeting re Rockefeller Univ.

I am loyal to you and appreciate the doors you have opened for us - so don't concern yourself re certain silly remarks.  The key is to maximize sales - lets just figure out how best to improve our marketing and sales performance!

Ciao,

Anthony

# EXHIBIT 7



Tel: +1 310 432 4374    Fax: +1 310 289 8186

Email – ag@offshorepro.com

1880 Century Park East

Suite # 200

Los Angeles

CA 90067-1600

**MEMORANDUM OF UNDERSTANDING**

entered into between

GinsGlobal Index Funds (Mauritius) Ltd ("GG")

and

Ascanio Carimati (" AC")

(A)     **WHEREAS** GG and AC are parties to an agreement in terms of which AC's responsibility is to represent GG in marketing the hindsight indexed product range (hereinafter referred to as "the product") within the European Union (excluding the UK) , Eastern Europe and the Middle East (excluding Israel) and to clients in other parts of the world identified and agreed to from time to time

(B)     **AND WHEREAS GG AND AC** shall be equal shareholders in both Hindsight Investments Group (SA) Switzerland and Hindsight Investments Group (BVI) Limited (hereinafter referred to as HIG) and both parties will be remunerated equally (50 - 50) from HIG as a direct result of all marketing and distribution efforts of the said product.

**WHEREBY THE PARTIES AGREE AS FOLLOWS:**

1.     The parties hereby acknowledge and agree that this arrangement will be a joint effort and both Hindsight Investments Group (SA) Switzerland and Hindsight Investments Group (BVI) Limited (hereinafter referred to as HIG) will be the entities incorporated to represent the parties' interests in this venture. Share certificates will have to be issued to both parties before signing this agreement. The bank account for HIG will be jointly controlled by both parties and both parties jointly are required to sign off on the bank accounts.

2.     The parties hereby acknowledge and agree that each party is responsible for their own costs in relation to promoting the hindsight product.

3.     The parties hereby acknowledge and agree that each party will only be remunerated from any of the net fees, (taking into account 3rd party commissions payable and agreed expenses payable i.e., ongoing company licensing fees etc), they generate from sales and distribution efforts in any part of the world.

4.     GG hereby acknowledges and agrees that an exclusivity arrangement in relation to the distribution of the said product within the European Union (excluding the UK), Eastern Europe and the Middle East (excluding Israel) only, is given to AC for an initial period of 12 months only (hereinafter referred to as the " initial exclusivity period), from date of signing this agreement provided that AC secures a minimum amount of $50million of inflows during this exclusivity period into HIG from the said product in this agreed time period. Should AC not secure such said inflows during that time period, this arrangement / memorandum of understanding will, without notice to the parties, automatically terminate, become null and void and will no longer be binding on the parties. Should AC however meet this minimum requirement of inflows during the agreed time period, then the said exclusivity arrangement rolls over for another 12 month period from date of expiration of the initial 12 month exclusivity period, with the same terms and conditions regarding inflows applicable to this second exclusivity term. This agreement expires after 24 months from date of signing hereof, should the parties otherwise not mutually agree in writing to extend the term of this said agreement.

5.   Notwithstanding clause 4 above, GG hereby acknowledges and agrees that an exclusivity arrangement for clients in other parts of the world may also be given to AC if AC supplies to GG a list of existing (and only if possible, potential) clients on an ongoing basis before AC may exclusively market to them to ensure that there is no conflict of interest with GG. Should a conflict arise then the parties will discuss as to how best to proceed to resolve this said conflict. Should AC not secure any flows within 12 months from any of the names on the list, then the name that he has not secured any flows from on this said exclusivity list, will be removed.   This list is confidential and remains the property of AC, however GG reserves the right to use this list to cross check these said names with other introducers and that no conflict of interest arises.

6.   GG and AC hereby acknowledge and agree that a variety of Hindsight index related products will be marketed by HIG.

7.   Hindsight Investments Group (SA) Switzerland distribution efforts will be focused on both institutional and retail channels, including but not limited to banks, insurance companies, asset/ fund managers and 3rd party distributors. The parties hereby acknowledge and agree that this Memorandum of Understanding shall be binding upon them upon signature by each of them.

8.   This Memorandum of Understanding may be executed in counter-parts all of which shall constitute one and the same agreement and shall be as effective as though both parties had signed the same document.

**UPON EXECUTION OF THIS MEMORANDUM, BOTH AC AND GG AGREE TO ABIDE BY THE FOLLOWING TERMS AND CONDITIONS:**

1.   AC and GG both agree to have the Statutes and Laws of the State of California govern this agreement without giving effect to any conflicts of law principles which may result in the application of the laws of any other jurisdiction.

2.   AC and GG are entering into this agreement in good faith However should a dispute or a legal suit arise, AC and GG both agree to challenge and to enforce the terms or provisions of this agreement in a court of law in the State of California in the United States of America, as set forth hereunder.

3.   GG will not take any responsibility (legal or financial) for any of AC's actions, or those of the appointed agents/ associates.

**TERM AND EXPIRATION DATE**

This agreement is binding on both parties for two (2) years from date of signature hereof unless written notice is given by GG within 3 months prior to the said expiration date to renew the agreement. The agreement may however be cancelled at any time by either party for cause, with prior written notice to the other.

## TERMINATION

GG may terminate these Terms of Business forthwith, at any time, with or without notice, should AC:

1. Act outside its authority.

2. Attempt to circumvent this agreement.

3. Enter into liquidation or become subject to an administration order.

4. Commit an intentional misrepresentation.

5. Breach confidentiality.

6. Be investigated by any relevant authority for misconduct or breach of fiduciary duty.

7. Commit a breach of fiduciary duty.

8. Commit a criminal act.

GG may terminate the Terms of the Agreement after thirty (30) days, if AC cannot cure:

9. A failure to make a full disclosure.

**10.** A material breach of any of these Terms of the Agreement.

AC must provide written notice of this termination to GG or its legal representatives.

GG may terminate the Agreement forthwith, at any time, by providing AC with written notice. Furthermore, GG agrees to notify AC of any matters that may lead to possible termination of this agreement.

Any termination of the Terms of this Agreement or the appointment of AC shall not relieve GG or AC of obligations taken by them, respectively, to which they are subject, respectively, prior to the effective time of termination.

## ASSIGNMENTS AND TRANSFERS

Neither Party may assign or transfer his or her rights or duties under this agreement without the express written consent of the other Party. Any transfer or assignment made without the consent of the other Party shall not relieve the transferor or assignor of his or her duties or obligations under this agreement.

AC is not entitled to sub-contract, outsource or assign any rights and obligations hereunder without the prior written consent of GG.

NEGATION OF PARTNERSHIP OR JOINT VENTURE

The parties agree that this agreement is not a partnership or a joint venture and shall not be governed by the partnership laws or joint venture laws of any country or state.

BINDING EFFECT

This agreement shall be binding upon the parties and their respective heirs, successors, administrators, executors, and assignees, subject to the provisions of this agreement.

ENTIRE AGREEMENT

This instrument constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior communications, whether written or verbal.   This instrument may not be modified or amended without the agreement of all the parties, in writing.

SEVERALITY

If any part, term or provision of this agreement shall be held void, illegal, or unenforceable, the validity of the remaining portions or provisions shall not be affected thereby.

EXECUTION

All parties represent and warrant that the execution, delivery and performance of this agreement does not violate, conflict or constitute a default under any Party's Articles of Incorporation, By-Laws, or any applicable law or regulation or decree of court or administrative body.

NOTICE REQUIREMENT

Any notices given by either Party to the other shall be in writing and may be transmitted either by personal delivery or by mail, registered or certified, postage prepaid with return receipt requested and properly addressed as below:

**If to AC:**                    **Hindsight Investment Group (SA) Switzerland**

                                 **48 Queen Anne Street**

                                 **W1M 9JJ London, United Kingdom**

**And if to GG:**                **1880 Century Park East**

**Suite # 200**

**Los Angeles**

**CA 90067-1600**

Each Party has the obligation to inform the other of changes in mailing address listed above.

Signed at _____ on this _____ day of _____ 2008.

**As witnesses:**                                      **For GG:**

1       _____              _____

                                       _____

                                       Anthony Ginsberg

2       _____              who warrants that he is duly authorised thereto

        _____


Signed at _____ on this _____ day of _____ 2007.

**As witnesses:**

1       _____              _____

                                       _____

                                       Ascanio Carimati di Carimate

2       _____              who warrants that he is duly authorised thereto

        _____

# EXHIBIT 8



| Tel: +1 310 432 4374    Fax: +1 310 289 8186 |
| Email – ag@offshorepro.com |

1880 Century Park East

Suite # 200

Los Angeles

CA 90067-1600

**MEMORANDUM OF UNDERSTANDING**

entered into between

GinsGlobal Index Funds (Mauritius) Ltd ("GG")

and

Ascanio Carimati (" AC")

44

(A)     **WHEREAS** GG and AC are parties to an agreement in terms of which AC's responsibility is to represent GG in marketing the hindsight indexed product range (hereinafter referred to as "the product") within the European Union (excluding the UK) , Eastern Europe and the Middle East(excluding Israel) and to clients in other parts of the world identified and agreed to from time to time

(B)     **AND WHEREAS GG AND AC** shall be equal shareholders in both Hindsight Investments Group (SA) Switzerland and Hindsight Investments Group (BVI) Limited (hereinafter referred to as HIG) and both parties will be remunerated equally(**50-50**) from HIG as a direct result of all marketing and distribution efforts of the said product.

(C)     **WHEREAS GG and AC** agree that this new agreement will super-cede all prior agreements signed by the parties.

**WHEREBY THE PARTIES AGREE AS FOLLOWS:**

1.      The parties hereby acknowledge and agree that this arrangement will be a joint effort and both Hindsight Investments Group (SA) Switzerland and Hindsight Investments Group (BVI) Limited (hereinafter referred to as HIG) will be the entities incorporated to represent the parties' interests in this venture. Share certificates will have to be issued to both parties before signing this agreement. The bank account for HIG will be jointly controlled by both parties and both parties jointly are required to sign off on the bank accounts.

2.      The parties hereby acknowledge and agree that each party is responsible for their own costs in relation to promoting the hindsight product.

3.      The parties hereby acknowledge and agree that each party will only be remunerated from any of the net fees, (taking into account 3rd party commissions payable and agreed expenses payable i.e, **ongoing company licensing fees etc**), they generate from sales and distribution efforts in any part of the world.

4.      GG hereby acknowledges and agrees that an exclusivity arrangement in relation to the distribution of the said product within the European Union (excluding the UK), Eastern Europe and the Middle East (excluding Israel) only, is given to AC for an initial period of 36 months only (hereinafter referred to as the " initial exclusivity period), from date of signing this agreement provided that AC secures a minimum amount of $100million of inflows during this exclusivity period into HIG from the said product in this agreed time period. Should AC not secure such said inflows during that time period, only this said exclusivity term **will automatically terminate, and will no longer be binding on the parties**. Should AC however meet this minimum requirement of inflows during the agreed time period, then the said exclusivity term rolls over for another 24 month period from date of expiration of the initial 36 month exclusivity period, with the same terms and conditions regarding inflows applicable to this second exclusivity term.

5.   Notwithstanding clause 4 above, GG hereby acknowledges and agrees that an exclusivity arrangement for clients in other parts of the world may also be given to AC if AC supplies to GG a list of existing (and only if possible, potential) clients on an ongoing basis before AC may exclusively market to them to ensure that there is no conflict of interest with GG. Should a conflict arise then the parties will discuss as to how best to proceed to resolve this said conflict. Should AC not secure any flows within 12 months from any of the names on the list, then the name that he has not secured any flows from on this said exclusivity list, will be removed.   This list is confidential and remains the property of AC, however GG reserves the right to use this list to cross check these said names with other introducers and that no conflict of interest arises.

6.   GG and AC hereby acknowledge and agree that a variety of Hindsight index related products will be marketed by HIG.

7.   Hindsight Investments Group (SA) Switzerland distribution efforts will be focused on both institutional and retail channels, including but not limited to banks, insurance companies, asset/ fund managers and 3rd party distributors. The parties hereby acknowledge and agree that this Memorandum of Understanding shall be binding upon them upon signature by each of them.

8.   This Memorandum of Understanding may be executed in counter-parts all of which shall constitute one and the same agreement and shall be as effective as though both parties had signed the same document.

**UPON EXECUTION OF THIS MEMORANDUM, BOTH AC AND GG AGREE TO ABIDE BY THE FOLLOWING TERMS AND CONDITIONS:**

1.   AC and GG both agree to have the Statutes and Laws of the State of California govern this agreement without giving effect to any conflicts of law principles which may result in the application of the laws of any other jurisdiction.

2.   AC and GG are entering into this agreement in good faith However should a dispute or a legal suit arise, AC and GG both agree to challenge and to enforce the terms or provisions of this agreement in a court of law in the State of California in the United States of America, as set forth hereunder.

3.   GG will not take any responsibility (legal or financial) for any of AC's actions, or those of the appointed agents/ associates.

**TERM AND EXPIRATION DATE**

This agreement is binding on both parties for five (5) years from date of signature hereof unless written notice is given by GG within 3 months prior to the said expiration date to renew the agreement. The agreement may however be cancelled at any time by either party for cause, with prior written notice to the other.

**TERMINATION**

GG may terminate these Terms of Business forthwith, at any time, with or without notice, should AC:

1. Act outside its authority.

2. Attempt to circumvent this agreement.

3. Enter into liquidation or become subject to an administration order.

4. Commit an intentional misrepresentation.

5. Breach confidentiality.

6. Be investigated by any relevant authority for misconduct or breach of fiduciary duty.

7. Commit a breach of fiduciary duty.

8. Commit a criminal act.

GG may terminate the Terms of the Agreement after thirty (30) days, if AC cannot cure:

9. A failure to make a full disclosure.

**10.** A material breach of any of these Terms of the Agreement.

AC must provide written notice of this termination to GG or its legal representatives.

GG may terminate the Agreement forthwith, at any time, by providing AC with written notice. Furthermore, GG agrees to notify AC of any matters that may lead to possible termination of this agreement.

Any termination of the Terms of this Agreement or the appointment of AC shall not relieve GG or AC of obligations taken by them, respectively, to which they are subject, respectively, prior to the effective time of termination.

**ASSIGNMENTS AND TRANSFERS**

Neither Party may assign or transfer his or her rights or duties under this agreement without the express written consent of the other Party. Any transfer or assignment made without the consent of the other Party shall not relieve the transferor or assignor of his or her duties or obligations under this agreement.

AC is not entitled to sub-contract, outsource or assign any rights and obligations hereunder without the prior written consent of GG.

## NEGATION OF PARTNERSHIP OR JOINT VENTURE

The parties agree that this agreement is not a partnership or a joint venture and shall not be governed by the partnership laws or joint venture laws of any country or state.

## BINDING EFFECT

This agreement shall be binding upon the parties and their respective heirs, successors, administrators, executors, and assignees, subject to the provisions of this agreement.

## ENTIRE AGREEMENT

This instrument constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior communications, whether written or verbal. This instrument may not be modified or amended without the agreement of all the parties, in writing.

## SEVERALITY

If any part, term or provision of this agreement shall be held void, illegal, or unenforceable, the validity of the remaining portions or provisions shall not be affected thereby.

## EXECUTION

All parties represent and warrant that the execution, delivery and performance of this agreement does not violate, conflict or constitute a default under any Party's Articles of Incorporation, By-Laws, or any applicable law or regulation or decree of court or administrative body.

## NOTICE REQUIREMENT

Any notices given by either Party to the other shall be in writing and may be transmitted either by personal delivery or by mail, registered or certified, postage prepaid with return receipt requested and properly addressed as below:

If to AC:                    Hindsight Investment Group (SA) Switzerland

48 Queen Anne Street

W1M 9JJ London, United Kingdom


And if to GG:                1880 Century Park East

Suite # 200

Los Angeles

CA 90067-1600

Each Party has the obligation to inform the other of changes in mailing address listed above.

Signed at _____ on this _____ day of _____ 2008.

**As witnesses:**                                    **For GG:**

1                                                    _____
   _____
                                                     _____

                                                     Anthony Ginsberg

2                                                    who warrants that he is duly authorised thereto
   _____


Signed at _____ on this _____ day of _____ 2007.

**As witnesses:**

1                                                    _____
   _____
                                                     _____

                                                     Ascanio Carimati di Carimate

2                                                    who warrants that he is duly authorised thereto
   _____

# EXHIBIT 9

**From:** Anthony Ginsberg [mailto:ag@ginsglobal.com]
**Sent:** Thursday, May 22, 2008 12:14 PM
**To:** Ascanio Carimati di Carimate
**Subject:** Updated Ascanio agreement - see draft attached

Hi Ascanio

Thanks for the updates re Lugano. I realize we need to finalize matters re Niki and Stockard too.
However our agreement should take precedence at this point and the past few days I have spent
considerable time with my Board members and others reviewing where we could adapt the
draft agreement we recently sent you (Friday May 9th).

Since the January 9th agreement was signed without my lawyers reviewing the final version - due to
the final changes you presented to me in New York which I signed - we have now ensured the 5
year contract term period is included in this new draft.  They had based the draft on an earlier Jan 8th
draft they prepared.  (Attached please see updated draft agreement.)

Unlike the Jan 9th agreement, the new agreement provides you with expanded exclusivity
areas including the Middle East and importantly protects you re clients in other parts of the world. We
have taken the earlier $50mn minimum inflow amount over 12 months (to retain the exclusivity) and
adjusted it to a total of $100mn to be achieved over 3 years. I recall you saying if we can't reach
these sort of numbers after 3 years we may as well all pack up and go home. After 3 years
the exclusivity period can be renewed for another 2 years - bringing it in line with our original Jan 9th
agreement.

I do not have a majority voting interest in GinsGlobal and my Board has opposed the granting of
an exclusive worldwide license and inserting all our Hindsight activities into 1 company with an
ultimate 50-50 shareholding.  There is nothing personal about this - they cannot see the benefit to
GinsGlobal of essentially giving anyone a 50% interest in the entire Hindsight business  at no upfront
cost (which we have built up over the past few years).  They believe there is clearly a significant value
to our shareholders re what we have already created and that future efforts are predicated on what we
have achieved to date - much like a new McDonald's franchise benefiting from the parent company's
prior success and thus paying the parent for the rights.   In addition our current Hindsight initiatives (re
AIG, Transamerica and others), further complicates the matter.  The Board frankly will not approve
of such an exclusive worldwide license and 50-50 arrangement  given the existing value we have built
up and the risks associated with such a decision.  This would be the case even with a large
corporation that had a significant global distribution infrastructure to offer us.

I truly believe the new agreement is fair and reasonable and in line with our original agreement and
discussions to work together. We have never given such long term exclusivities before on wide-
ranging areas/regions (as in the attached agreement) to anyone we have previously worked
with.   Such exclusivities protect you - ensuring the two of us do not in any way compete.

I realize in recent months you have requested additional commitments such as the exclusive world-
wide license and sharing 50-50 globally on all our Hindsight fees, but I do not have the sole power to
give this to you and this was not the original intent when we first began to work together.  As
previously mentioned, I believe we have a good working relationship and look forward to continuing
this - however I am not the sole decision maker here and am unable to give you everything you
want.  I have no doubt we can be successful together and based on the flows you help secure - we
can utilize the new Swiss & BVI companies being incorporated.

Please review and I am happy to address your concerns.  I sincerely hope we can find a middle
ground and move forward.

Kind regards and Ciao,

Anthony

# EXHIBIT 10

**From:** Ascanio Carimati di Carimate
**Sent:** Thursday, May 22, 2008 7:39 PM
**To:** 'Anthony Ginsberg'
**Subject:** RE: Updated Ascanio agreement - see draft attached

Dear Anthony,

I.    I have briefly read over the agreement and I can make some preliminary comments:

     a.   It still in no way reflects our clear, verbal agreements in place since Feb 2008.

     b.   Any new agreement should logically take our agreement of January 19, 2008 as a basic <u>starting point</u>, and should not contain any elements which circumvent or lessen said agreement.

         i.   It is my understanding after reading this latest draft, that you still expect me to surrender terms I already have in place in order to receive the Middle East (excluding Israel) as an additional market.

II.    Ignoring the fact that there is no element in this new draft that gives consideration to our verbal agreement of Feb 2008 (which includes markets such as Latin America, Asia, and the U.S. which we have clearly discussed and already gone after together), GG proposes that I modify my agreement of January 19th 2008 in order to obtain the Middle East by:

     a.   Renouncing my rights to the UK market!  The UK represents my largest potential market and is by far of greater interest to me than the Middle East (as most Arab monies still pass through London anyway).

     b.   Accepting a minimum financial threshold to keep the agreement valid when none is currently in place.

    c.  Accepting a reduced term to my exclusivity (with the <u>possibility</u> of an *extension* to the term I <u>already</u> have in place).

    d.  Negating any partnership or joint venture when we already agreed that we have a JV in place.

        i.  However, despite not having a JV or partnership in place, GG must still hold 50% of all the shares of HIG and joint control of the bank accounts according to this new draft? Contradictory in my opinion.

    e.  Negating my ability to assign or develop sub agents…. How do you define what we have been doing until now with the likes of David Stockard, John McCloy, Brian Lippey, Niki, NRC (Andrew Klivan), Iveagh (Guinness), etc?

        i.  This as well as other clauses were developed jointly by you and me to purposely tie the hands of our distributors. I am surprised you are recycling these points to me, as <u>we</u> clearly developed them to favor only "our" side.

Anthony, not only did we come to a very specific verbal agreement over several extended discussions in February, which so far no draft gives consideration to, but for the second time I have received a draft which requires me to give up rights I already have.

III.   You used the example of a McDonald's franchise in your email below. Unfortunately, Hindsight or GG does not have the same brand recognition as McDonalds. If it did, I agree the situation would be much different (as would have been my agreement of January 19th). In fact, the core reason we came to our verbal agreement in Feb was to develop a powerful, global Hindsight brand, together. I do agree that AIG is a major public achievement, but you also admit it is of relative benefit in the markets I have a mandate to develop. Also, with all the due respect and admiration you know I have for you, it took GG 4+ years to add AIG to Transamerica as a "trophy" insurance client. I created an opportunity in which we are able to obtain probably our biggest insurance client (surely in terms of international brand recognition) in less than 5 months after you identified it as a target to me.

IV.   There is absolutely no Hindsight presence in the markets I am developing. Would you accept a term of 1 year or even 3 years to develop a highly competitive and mature market from scratch just to have it taken from you 1-3 years later? (You know it can take even longer to get a product licensed and to market in even the most efficient EU markets – not to mention that we deal in more restrictive structured products.)

From my point of view my 5 year term is a compromise as it does not make provisions for automatic renewal for another 5 years. I took a chance on your honesty and sense of fair play knowing this risk, as I realize you were taking a chance on me. I am creating a market from scratch here for our mutual benefit at no small financial expense to me - with no guarantee of returns or stable income. So far, in 5 months, we have moved farther along in Europe than GG (ref Hindsight) has in 6 years.

V.   <u>Could you please *immediately* clarify in writing your intentions for:</u>

a.   The creation of a Hindsight Fund that we have been discussing doing together? I have invested time, monies, and effort on this, and do not want there to be any surprises or misunderstandings. As I have not heard more in merit I would like to know where we stand.

b.   **My retaining exclusive rights to 50% of any and all business obtained and/or derived from any and all of my introductions anywhere in the world, without expiration or qualification.** Specifically, John McCloy & Co., David Stockard & Co., Allianz, etc. Your comments in the email below that this second, new draft agreement "importantly protects you re clients in other parts of the world" implies to me that you do not consider such protections currently in place. I take this very seriously as I acted in good faith based on our very clear agreement to form a global, exclusive partnership together <u>and</u> based on your additional personal assurances that you would fully respect our 50/50 split and exclusivity for any introductions made outside of my mandate. As a direct result, I proceeded with introductions (and we both proceeded with negotiations) with clients/distributors to develop business in the United States, Asia, and the rest of the world. This is easily demonstrated by our talks with AIG (Wisner) for business in Asia and Europe, our talks with Brian Lippey and others ref the Hindsight Hedge Fund (world-wide), Fairfield Greenwich (world-wide), David Stockard & Co (U.S. and World-Wide), Rockefeller University (U.S.),

Attorney/Client Communication    Private and Confidential

NRC (U.S. and Asia Life Insurance), Pembroke Pacific (U.S. based out of San Diego), Ron Daniel (U.S.), and Allianz (U.S. and worldwide) to name only few of the targets we have identified and approached together to develop business outside of my mandate.

VI.    Conclusion:

Anthony, I truly admire and respect you not only professionally, but as a person. As I have stated too many times, I hope to build a real partnership with you and a real friendship. However, asking me to relinquish terms I already have in place is unreasonable, and I interpret it as an attempt to make me take a step back from our partnership.

I fully understand and respect your concerns and the points you make reference protecting your interests, but I also expect the same consideration. I still remain totally open to finding an adequate solution, but I expect any new solution to use what I already have in place with you as the underlined starting point. From there we can find ways to respect the verbal agreements we came to in Feb, while totally addressing your newly expressed concerns. I do not think this unreasonable. Would you if the situation were reversed?

I have always dealt with you with the clear understanding that you have full power to negotiate and speak on behalf of the company that holds your name. Let's not detract for what has so far been an excellent and productive relationship by implying that this is no longer the case.

Sincerely,

Ascanio

# EXHIBIT 11

**From:** Ascanio Carimati di Carimate
**To:** McCloy, John J.
**Sent:** Fri May 23 12:10:55 2008
**Subject:** RE: Re:

Dear John,

I am sure you are also finding it exhausting always discussing the same issues... particularly when we agreed upon a fresh start with a better understanding of how things should proceed in the future.

Though I appreciate many of your comments in your email below, it is important to note that Hindsight Investments Group is a corporation owned by myself and GinsGlobal Investment Management. Acting in the best interest of Hindsight means acting in <u>my</u> best interest and that of <u>GG</u>, but this does not include deciding on a course of action for us. Also, I would have hoped to have had a particularly close relationship with you: not only from the point of view of my ties to your son; but because I alone brought you on this project. I had hopes that you would not only advise the company, but me personally.

If there was any issue that needed attention, particularly any pertaining to me, you should have discussed it first, and only, with me. Only GG and I have the authority to decide on the best path for the company, and day to day operations are clearly my responsibility as director. I and GG are the first to want this company to succeed; no one else is in a position to decide what is best for us. What we expect is normal protocol in any similar situation, and nothing to do with ego or hurt feelings as was suggested. We obviously have a vested interest on finding the best solution for all parties involved, however this is solely our responsibility.

Suggesting that there was any need or right to go to Anthony in private to comment my abilities caused major tension, confusion, and delays within the company. As your own email requesting updates attests to, attempts to circumvent me have made things more complicated/less efficient, placed unnecessary extra work on Anthony, and created an unhealthy atmosphere of politics in the company. This has had serious consequences on other agreements I was in the process of completing with Anthony: Anthony should have never had to come to me to express that he has not seen as many politics in 8 years of running GG as he has in the past 8 weeks with HIG.

It was inappropriate and unnecessary for this situation to have been created. If there were any issues pertaining to me, I should obviously have been the first approached. Not only would this have kept things transparent and in line with protocol, but I would have most certainly eagerly listened to any comments that you had and immediately implemented your advice, with enthusiasm – I believe we all have room to better ourselves. Part of the reason I asked you to come on board was to this end. Perhaps you do not realize that I have given you the same consideration I expect: I have sponsored your presence at every meeting stemming from your introductions, at my personal expense, so as to make you feel comfortable that you are fully involved – there was some concern internally over these additional expenses, so I covered them out of my own pocket as I did not find it appropriate to exclude you even though your presence was not always necessary. I did this because it was the correct thing to do. Giving you proper consideration would have been even more necessary if you were owner and director of the company.

I am certain you understand exactly what I mean and exactly the consequences of your actions, and we do not need to go back and forth on this anymore.  With your life experience you are in a position to teach me a few tricks, not the other way around!

I hope we can really try to move on without having to address issues of this type again.

Truly enjoy VT!


Ascanio

# EXHIBIT 12

**From:** Anthony Ginsberg [mailto:ag@ginsglobal.com]
**Sent:** Thursday, May 29, 2008 3:08 AM
**To:** Ascanio Carimati di Carimate
**Subject:** Update

Hi Ascanio

This is certainly not an e-mail I ever wanted to write.

Unfortunately since it seems we are now at an impasse re agreeing on the terms for a new agreement and cannot find a middle ground as how to best to move forward from here, I have been advised that it is best for both of us to not continue to develop and pursue our business relationship at this point.

It seems we cannot give you what you want.  Of course we will honour all existing introductions you have made to date.

It appears that our styles and business understandings are different and cannot be reconciled and thus I frankly cannot see us having a good working relationship going forward.  I am also tired of all the politics and frankly don't have time for this given everything on my plate at this stage.  After much soul-searching, I believe it is therefore best for both of us to go our separate ways unfortunately.

GinsGlobal therefore hereby notifies you of its immediate cancellation of our agreement dated January 9th 2008.  We believe we can no longer perform under the existing agreement and hereby tender our notice of cancellation and cease all our related activities with yourself, forthwith.

Kindly confirm your agreement hereto.

With much regret,

Anthony

Anthony Ginsberg CPA
Managing Director

## GinsGlobal Index Funds Ltd
**www.ginsglobal.com**
Tel:   (310) 432 4374 (w)
        (310) 801 4974 (cell)
Fax:  (310) 289 8186

# EXHIBIT 13

**From:** McCloy, John J. [mailto:JMcCLoy@gravitastechnology.com]
**Sent:** Thursday, May 29, 2008 10:54 PM
**To:** Ascanio Carimati di Carimate
**Subject:** RE:

Dear Ascanio

I clearly recall the comment you made. I think you should ask Anthony what he imparted to me directly. They were his comments based on discussions he had with his board and I should not paraphrase. I will say that he did not give me any cause to believe that any comments or actions on my part were critical or even factored into his board's decision.

Since it was really GinsGlobal's board that took the decision and I was not privy to that discussion, I again believe that someone who was present should fill you in on the situation as I could only answer third hand.

I was asked that, hopefully, there were a way I could work with Hindsight. I responded by telling Anthony that I would do so happily only if contracts with you were honored and that you were properly remunerated. He totally agreed.   As far as others dealing with Hindsight were concerned, I would imagine that they would be pursued as if nothing had happened and just that their direct contact would be someone at GinsGlobal, if not Anthony himself. If successful, then obviously, under your contract, you should and would be compensated.

I can assure you that my impression of Anthony's feelings and comments were that he is very fond of you and wants you to succeed in whatever endeavor you enter and that an arrangement can be reached that will compensate you for anything covered by your contract. He told me that he felt that things were not working out as hoped between you and GinsGlobal but, that in business, those things happen and in everyone's interest it was time to move on.

Both Anthony and I are deeply distressed that things got to where they are and both of us are determined that you are fairly treated, not only as you are a good friend but because, professionally, it is the correct thing.

I hope that you and I can remain friends. I can assure you that whatever decsion was taken did not emanate from me. I did feel that there was a more appropriate role for you than the one portrayed but that was the extent of my comments except when contacts I had made expressed a desire to work directly with Anthony and then that was the sum of my comment.

With  warm regards

John

**ORIGINAL**

AO 440 (Rev. 02/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the
CENTRAL DISTRICT

| | | |
|---|---|---|
| ASCANIO CARIMATI DI CARIMATE, an individual | ) ) ) | |
| *Plaintiff* | ) | Civil Action No. |
| v. | ) | |
| GINSGLOBAL INDEX FUNDS; a California corporation; and ANTHONY GINSBERG, an individual | ) ) | **CV09-2373** AHM (RZx) |
| *Defendant* | | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

GinsGlobal Index Funds
c/o Anthony Ginsberg
880 Century Park East, Suite 200
Los Angeles, CA 90067

Anthony Ginsbert
880 Century Park East, Suite 200
Los Angeles, CA 90067

A lawsuit has been filed against you.

Within 20 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Stanley W. Levy (SBN CA 038051)           (310) 312-4000
Craig J. De Recat (SBN CA 105567)          (310) 312-4224 (Fax)
Craig S. Rutenberg (SBN CA 205309)
Manatt, Phelps & Phillips, LLP
11355 W. Olympic Boulevard
Los Angeles, CA 90064

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: ___APR - 6 2009___

*Natalie Hongcua*
*Signature of Clerk or Deputy Clerk*

American LegalNet, Inc.
www.FormsWorkflow.com

41381575.1

AO 440 (Rev. 02/09) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4(l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $. _____

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                       *Server's signature*

                                              _____
                                                       *Printed name and title*

                                              _____
                                                       *Server's address*

Additional information regarding attempted service, etc:

American LegalNet, Inc.
www.FormsWorkflow.com

41381575.1

COPY TO
CONFORMED

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| Ascanio Carmimati Di Carimate | GinsGlobal Index Funds and Anthony Ginsberg |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Stanley W. Levy ( Bar 038051) / Craig J. De Recat (Bar 105567)<br>Craig S. Rutenberg (Bar 205309)<br>Manatt, Phelps & Phillips, LLP<br>11355 W. Olymipc Blvd., Los Angeles, CA  90064<br>(310) 312-4000 / (310) 312-4224 (Fax) | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question (U.S. Government Not a Party

☐ 2 U.S. Government Defendant

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No     ☒ **MONEY DEMANDED IN COMPLAINT: $** At least $75,000.00

**VI. CAUSE OF ACTION** (Cite the U. S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. Section 1332

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☒ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | **REAL PROPERTY** | ☐ 445 American with Disabilities – Employment | ☐ 640 R.R.& Truck | ☐ 61 HIA(1395ff) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | ☐ 210 Land Condemnation | | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 446 American with Disabilities – Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | **IMMIGRATION** | | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 462 Naturalization Application | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | | ☐ 465 Other Immigration Actions | | ☐ 871 IRS-Third Party 26 USC 7609 |

**CV09-2373**

**FOR OFFICE USE ONLY:**     Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)     CIVIL COVER SHEET     Page 1 of 2

American LegalNet, Inc.
www.FormsWorkflow.com

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Italy |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County |  |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County |  |

\* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date   April 6, 2009
Craig S. Rutenberg

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com